Case No. 22-PT89 et al. Shawnee Tribe and Nikosuke Tribe of Indians of Florida, 20 CD 2792, Primary Bandhood Zawah Domination, 21 CD 12, effelents, v. Janet L. Yellen, in her official capacity as Secretary of the United States Department of the Treasury et al. Mr. Blank for the effelents, general issues, and issues specific to the Primary Bandhood Zawah Domination. Mr. Abney for the effelents, issues specific to the Nikosuke Tribe of Indians. Mr. Jeff for the effelents. Thank you. Welcome, Counsel. Thank you, Your Honor, and may it please the Court, James Blank on behalf of the Primary Bandhood Zawah Domination. There was a preliminary, before this argument, Your Honor, this Court directed some briefing on the issue of jurisdiction. If the Court doesn't have any specific questions on that issue or if the Court wants to hear argument on that issue, I'm happy to offer argument on that issue. Otherwise, I would proceed to the merits. Your Honor, this is the second time that this Court has had the opportunity to address Treasury's distribution of CARES Act funds. Under the statutory mandate, the Treasury was obligated to distribute funds based on increased expenditures. The last time before this Court, it considered the argument of Shawnee Tribe, which was a tribe that was zeroed out under the IHBG population metric that Treasury had chosen for per capita worth 60% of the Title V funds. The Primary Bandhood Zawah Domination participated as an amicus in that argument, as did my co-appellants, Nikosuke Tribe. When considering Shawnee's argument in that case, a case that Shawnee had lost at the district court level on the issue of reviewability, this Court reached at least the preliminary injunction merits and concluded that the IHBG population metric was not a suitable proxy for population. The Court therefore remanded. While the case was on remand, the Treasury developed an alternative methodology, what we call in our papers the revised methodology. In the revised methodology, the Treasury took the top 15% of tribes that were most prejudiced by the choice of the IHBG population metric and cut off the remaining 85% of the tribes. Within that 15% cutoff, the Treasury calculated what we call the shortfall calculation. The shortfall calculation was a pretty clear calculation of the difference that the amount that the tribal government would have received in a world where tribal enrollment had been considered versus the world that it actually occurred where the IHBG population metric had been considered. This gave Treasury at least a clear calculation of the difference and the effect of their poor choice of the IHBG population metric. Treasury then took the fatal mistake of implementing what we call the phase-out. In the phase-out, within that top 15%, Treasury elected to award 88 88s of the shortfall calculation to the tribal governments at the very top of the ratio rank. At the bottom of the ratio rank, Treasury only awarded one 88. It created a linearly descending allocation so that the tribes at the very highest received the greatest percentage of funds in that shortfall calculation. I understand that you make two arguments. One is that the statute prohibited the Secretary from doing this. And the Secretary responds, well, look at the terms of the statute in terms of vesting discretion in the Secretary. Then secondly, as I understand it, you argue that the allocations should have been equal, even if the Secretary wanted to phase out in terms of looking at the top 15, whom it considered were the worst off. Everybody within that lesser group should have received the same amount. Have I stated your arguments accurately? Yes, I think that's a fair summary of our arguments. So to rule for you, we would have to find that although the statute gave the Secretary this broad discretion, in fact, that discretion was limited. And notwithstanding the Secretary's consideration of the fact that most of this money had already been distributed, there was some poor data in terms of exact numbers, and the Secretary's opinion explains that. She really could only divide whatever amount she found was still available by 15. Why is that a reasonable way to view the Secretary's legal authority under the circumstances when she was ruling? In Shawnee 1, Treasury tried to avoid any review of its allocation. Treasury lost that argument, and this court remanded and granted a preliminary injunction. Right, so we're beyond that. I'm trying to focus on where we are now in light of our previous decision. Our argument is that Treasury needed to maintain its allegiance to the statutory mandate. The Secretary had a statutory mandate to track increased expenditure, to anticipate increased expenditures, both in 2020 and 2021. Suppose she found that the data, while based on her revised methodology, was much better and consistent with the statute. Nevertheless, she could make no distinctions, maybe for that reason, between the top 15. As a preliminary matter, there is no explanation for why there's no explanation with any connection to increased expenditures that Treasury used in its contemporaneous decision-making on the issue of why it was going to implement the phase-out. That doesn't appear in the administrative record, and it's illogical on its face. If we look at how it affected the actual litigants, we end up with a per capita distribution to Prairie Band Potawatomi of approximately $900, a per capita distribution to Shawnee Tribe in excess of $1,700. And on net, we look at an enrolled population for Prairie Band Potawatomi of 4515 by the government's old numbers, and an enrolled population of 3,000 for the Shawnee Tribe. Despite having a total population that's 50% greater than Shawnee Tribe, the Prairie Band received 30% less funds, even after accounting for the initial distribution in the IHBG methodology. Your Honor asked about the fact that the Secretary has tried to excuse for decision-making on the basis of the fact that money had already been distributed. The case law does not justify agencies deviating from statutory terms just because of finite resources. Really here, from the very beginning, there was no chance or no expectation, I don't think in the statute, that that $8 billion was actually going to resolve every increased expenditure that tribal governments were going to face. It was finite resources in 2020 that remained finite resources in 2021. The Secretary's position, and I just want to be sure I understand your argument, is that even if where we are now in terms of the distribution of this money and what's happened, and the Secretary's essential acknowledgement about the error of her first methodology, she has changed that methodology, accepted basically your arguments in that regard. But she's looked at in her or the Secretary's view, those who are worse off, and that's the 15. And she makes distinctions between them. And your view is given the statutory provision about increased expenditures, the Secretary would have to determine that any distinction between those 15 must pertain to increased expenditures?  In other words, what I'm trying to understand is, look, the Secretary says most of this money has already been distributed. But there are these 15 that are left as the worst off among everybody who is claiming this limited amount of money that's left. And so at this phase, the analysis shifts a little bit. It's no longer at month one, where the Secretary has the full amount. That's been distributed. So there's this small amount that's left. And what's to be done with it? In other words, if it were redistributed, as I think you're arguing, if it went to everybody who is claiming, then it would just be a minuscule amount. On the other hand, if she looks at those who are the worst off, notwithstanding the distribution, she's going to focus on that group. And among that group, she's going to draw distinctions. And your argument is that given the statutory term of increased expenditures, that is all that the Secretary could look at, even if she could find these 15 are the worst off. And that even with the new methodology, there was bound to be some uncertainty about numbers. And the Secretary's reasoning explains that. And so she made a judgment. I keep saying she, but I mean the Secretary, just made a judgment about what do I do with this very limited amount of money. And you're just saying that is clearly not authorized by the statute and it's an abuse of discretion. That's correct, Your Honor. Within the 15 percent, which amounted to 88 tribes, the Secretary should have endeavored to equalize the per capita payments. In the methodology underlying the 2021 revised methodology, there's no statement of why we're going to move away from justification for moving away from a per capita approach. Really, if you read the statement, it's simply saying we're going to make enrollment-based allocations rather than IHBG-based allocations. And then they implement phase-out. The phase-out, without justification relating to increased expenditures, creates these perverse gross disparities in distribution. And the Treasury had the shortfall calculation that would have given the Treasury a very straightforward low start to resolve this with more than $80 million in funds. I don't think that there's any. In other words, there has to be some justification. It's not that Puriband is on its own. It was intentional that Treasury would distribute funds to create gross disparities in per capita distributions between the low end of the 15 percent and the high end of the 15 percent. And there's no rational basis. There's no rational even post hoc justification that's ever come up for that. It's just excuses about the finite resources, excuses about discretion. And that is not meeting the burden of rational decision-making by agency. Let me go back into the record a little bit here because it appears that within the briefs, the trial record, that the numbers keep changing. And so do you all have an accurate basis for what actually got paid out? What were those distributions? What statistics were used in terms of populations and things of that nature? At many points in the course of this, those numbers were very opaque, even to the litigants. If you look at the record, there's no hard and fast statements regarding what numbers were used when. For example, both in 2020 and 2021, the Treasury had solicited enrollment figures, which led litigants to believe that those solicited enrollment figures were the ones that would be used. Ultimately, we found out that they used enrollment figures that had been maintained by the federal government separate from the solicitation. The Prairie Bands received approximately $4 million in sum from the 2020 distribution and the 2021 distribution. In addition, that 2021 distribution, because of an intervening error that was subsequently corrected, there was a disparity between the time that the case was commenced until the second amended complaint was filed until we sit here today in which another payment was made. Likewise, Miccosukee received a payment in 2022, but there's no dispute in that the Treasury's briefing on this is quite clear that Prairie Band would be entitled to relief from an additional payment. Prairie Band has not been treated the same as Miccosukee Tribe, as Shawnee Tribe. Do you dispute the different methodology that's used the second time, or is it just the rationalization for that methodology? We note that the rationalization is lacking, but we dispute the methodology. We don't think that there could be any rational basis to treat these tribes at the top and the bottom of the 15% cutoff with such gross disparities that a tribe would receive half of the per capita distribution. Prairie Band received $900 per enrolled member, whereas Shawnee has received approaching $1,800 per enrolled member. What's the remedy at this point? Because there's obviously a lot less left, and so what's the remedy at this point? Prairie Band proactively obtained an injunction on $7.6 million at the same time that Miccosukee obtained an injunction from less than $2 million, which left $9 million at issue. Those funds have been drawn against in the 2021 distributions. Those funds remain, and our understanding is that those funds are sufficient to bring Prairie Band Potawatomi in parity with the best treated tribes within the 15%. The court should direct, and I understand that the court, there's not enough data in the record to give the court specific dollar value, but what the court should do is remand and direct treasury to make an award that brings Prairie Band Potawatomi and Miccosukee tribe, to the extent they have not already been treated so, into parity with the best treated tribes within the 15%. But how do they do that in terms of any calculation other than you asking us to make them award exactly that $7.6 million? Should they be using any type of methodology, or are you asking us to just direct them to that payment? No, Your Honor. I think that the methodology would be encapsulated in the, we think that the way that the best treated tribes were treated was a fair way of treating the best treated tribes. Every other tribe after that 88 out of 88 was treated unfairly. We would just want to be receiving funds on the 88 out of 88 fraction. Okay. So I don't, there's no additional calculations that need to be made. In fact, Treasury has demonstrated that it has both the funds and all the data it needs to make subsequent distributions to tribes like Miccosukee tribes and other tribes that were near the top, equal them out with the 88 out of 88s. And those payments went out, our understanding is only weeks ago. So we don't think that there's a great deal of additional number crunching that needs to occur for Prairie Band to have a remedy here. But I'm trying to wrestle with the fact that we can't, they have discretion. They're supposed to use that discretion based on the increased expenditures and rationalize that. So we can't really direct them to say this amount of money automatically paid to Prairie Band and or the other tribes. So I'm trying to get a balance of that. When you say remand, they're still supposed to have some judgment in how they come up with their calculations. So how do we attribute language correctly to make sure that they do that and that we're not back here? The language should say that Prairie Band and Pottawatomie is entitled to be treated on the same terms as the best treated tribal government within the top 15%. And Judge, when you were responding to Judge Rogers earlier, you were using the term worse off. What data or how do we consider who's worse off in this regard? We think that these justifications that we see that weren't in the contemporaneous decision making but did appear in arguments before the district court and were adopted by the district court are flat wrong. There's no way that the zero tribes or the 88 out of 88 tribes was wronged in a way that is different in kind than the way that Prairie Band and Pottawatomie was wronged by the choice of the IHPG population metric. It's a quantity, a qualitative versus quantitative distinction. Everything could be captured in that shortfall calculation, which was the way to quantify the harm in a way that was connected to increased expenditures. And anything that would consider any other sort of harm, optics harm, some sort of harm attributed to zero, including the number of zero, to the extent that's a harm at all, that's not a harm. In the original statute, there was no intervening change in the law that allowed this to work as some sort of remedial statute as an apology to the zero tribes. They should have approached it on a one-to-one quantitative basis with the error to the tribes at the top of the 15% and at the bottom of the 15%. And is this request that you would have, would that be a reversal or vacate the judgment? Do you have thoughts there? It would be a reversal of the district court's decision. Counsel, let me follow up on Judge Child's question. This court, in order to rule in your favor on the question of law, would rule, as I understand it, that because of the statutory requirement of increased expenditures, that is the only legal factor that the secretary could properly consider. Therefore, wouldn't it follow as to, in terms of the secretary's responsibility, to follow the law as clarified by this court, as you request, wouldn't the secretary be required to take whatever amount is left, look at the increased expenditures, if any, by all 85 of the tribes in the top 15%, see what each can come forth with, and then allocate? And it may well be that your client or the appellants, petitioners, would not end up at the top. But along the lines you're arguing, the secretary would have followed the statutory directive of increased expenditures. So, I mean, for all the reasons Judge Child's question suggested, but I just want to be clear that even accepting your legal argument, our order of reversal and remanding, as you would request, would not at this point be able to direct that appellants end up at the top. Do you get the point? That if we hold that there was a violation of law in distinguishing, because of the statutory provision, and the secretary's failure to provide an adequate explanation, the secretary would have to look at all 85. And just suppose, hypothetically, the secretary did so, and had firm figures to show that, just hypothetically here, some of the other 85 had greater expenditures than the appellants here. Wouldn't the secretary be obligated to adjust the awards accordingly? I don't think that's, I don't think it's necessarily the case. I don't understand. We're telling the secretary, in your view, that the secretary was legally in error, not to consider the statutory factor, and send it back. And you seek an order that says, giving appellants preferential treatment. But how could we do that without getting the information that you say the statute requires from the secretary, and then seeing what the secretary comes up with? I think that Shawnee 1 is instructive on this point. The remedy in Shawnee 1 was not a simple remand. It was remand with specific instruction to the district court to implement an injunction in the amount that Shawnee had asked for. I think this recognizes that even if all the tribes, if every tribe can't be resolved, and every error can't be resolved, it's rational, or it's acceptable for the court to fashion a remedy that would allow the litigants to have a remedy, and to be treated fairly, and to not be treated arbitrarily and capriciously. That's implicit in the injunction that the court ordered in Shawnee 1. So if the secretary on remand were able to come up with a rationale and explain it, wouldn't that suffice? In other words, I'm not sure the remedy, and maybe I'm wrong about this, and maybe Judge Childs and Judge Sullivan will disagree. I think that the remedy can be quite as simple as you request. Reverse and remand, and the appellants get as high as the top tier. Isn't it a bit more complicated if we say there was an error of law? The treasury, as recently as six weeks ago, made payments to several tribes that were no different than the concept that Prairie Band is seeking to obtain. I understand that, counsel. Maybe we just drop this because I realize our argument has gone over, but that's one of the concerns I have on the remedy you seek. Any remedy, any amount that fixes the shortfall embodied in the 2021 distribution would be a win. I understand that point. Thank you. Thank you, Your Honors, and may it please the court, George Abney, on behalf of the Miccosukee Tribe of Indians of Florida. I think it's relevant to let the court know that for the Miccosukee Tribe and for many other Native American tribes, the past is not really the past. The past is always present for the Miccosukee Tribe, as it is for many other tribes, and the past and the Miccosukee Tribe's unique history informs how the tribe operates and carries out its business on a day-to-day basis, even today. So, counsel, could I just be clear that in the supplemental briefs, the Secretary argues that the tribe has received all of the funds to which it was claiming. Are you disputing that, or have you conceded that? We have received the supplemental payment of approximately $117,000 that Treasury represented they would be sending to us. Is that what the tribe sought? No, Your Honor. What we sought in our claim below, and this is in our second amended complaint, is to be treated consistently with how tribes were treated in the 2020 distribution, and that amount is reflected in the amount of the injunction that the Miccosukee Tribe sought that this court ordered and that the district court put in place. And that amount is approximately $2 million. Thus far, the Miccosukee Tribe has received just short of $1 million. All right. So what else did you make clear that you were seeking from the Secretary? Well, this case is about receiving funds, and so we believe that we have made our case clear at the court below that what we were seeking is to be treated on par with tribes that received an additional – that received a distribution in 2020 of approximately $3,000 per member. Thus far, Miccosukee has received a distribution of approximately between $1,500 and $1,700 per member, and that is a significant disparity, Your Honor. Okay, I get that, but I'm trying to understand this additional amount. If your injunction was for $2 million, and that was to make the tribe whole, and let's just hypothetically assume, as you admit that you received $1,700, and let's also assume, for purposes of argument, that the tribe gets the other $300, then have you received all – has the tribe received all the relief? I mean, this is just a jurisdictional question, Counselor. No, the tribe has not received all of the relief that it has claimed in the court below. And you would point me to? I would point you to our second amended complaint, where we requested to be treated on par with the tribes that received a 2020 distribution of approximately $3,000 per member. And I would also point the court to the injunction that was entered in the court below, and the approximately $3,000 per member calculation resulted in approximately $2 million being placed under injunction. So, you're suggesting that issue is not moot, then? No, we do not believe the question is moot. And further to that point, Your Honor, I certainly give the government credit for attempting to remedy an error in paying Miccosukee an additional amount of funds, but there are certainly lingering questions about that error, and we don't have enough facts in front of us. We don't believe the court has enough facts in front of us to determine whether or not Miccosukee is now being treated on par with the other zero tribes that received a distribution – a second distribution in 2021. The record is just – it's really just a letter from Mr. Jed, and it's the fact that we did receive an additional payment. We have no idea what the other zero tribes may have received. We don't know if we're being treated on par with the other zero tribes. So, we don't believe our question is – our case is moot, and any time new facts are introduced into evidence, of course, those new facts need to be held up to scrutiny and examined, and we have not had the opportunity to do any of that. So, I would – Go ahead. Excuse me, Judge Johns. Go ahead, Judge Rogers. Thank you. No, no, no. You finish your thought. No, I was just going to ask you the same question about the remedy, because if we send it back and then there's a recalculation on method given discretion to the treasury with respect to the method of allocation, are you risking, again, as Judge Rogers was indicating, perhaps a prorata share, perhaps a description of a tribe being placed back into the pot, things of that nature? So, what's your view on the remedy? Well, Your Honor, I – you know, and we provided some supplemental briefing on this point, and maybe the supplemental briefing that we provided didn't quite answer all of the court's questions, but I think – I'm not sure how much of that money the treasury has left. Apparently, they have some amount of money left, but we don't know the precise amount of that money. But there is – there remains approximately $7 million under injunction, and that money, approximately $5 million, is reserved for Prairie Band. Approximately $2 million is reserved for Miccosukee. I'm sorry. Approximately $1 million remains for Miccosukee. I don't know the exact number that's under injunction, but it's my understanding that those funds are reserved for payments to Miccosukee and to Prairie Band, and I don't believe there's any bar using those funds to pay Miccosukee and Prairie Band. And it's a matter of appropriations law, and perhaps a supplemental briefing would be appropriate on this issue, but if another trial were to file today or tomorrow, I don't think they would be entitled to any of those funds that are under injunction right now. So, I don't think we really run the risk that – Well, and that's what I was getting at, too. You say under injunction for just those two tribes, not to go back to a general pot? That's my understanding, Your Honor. And your understanding comes from where? My understanding is Judge Maeda's order specifically reserved that money for Miccosukee and Prairie Band. The 2021 distribution and then the 2022 distribution that Miccosukee received, $117,000, all of that was drawn down from the money under injunction. And that other monies that were paid to other tribes other than Miccosukee and Prairie Band, those came from some other source that sort of remains unknown. We don't know. Apparently, it's some CARES Act money that was left over from the distributions to the Alaskan Native Corporations in the Chihalas case. But I don't really profess to have a lot of insight into other monies that Treasury has. Well, I'm afraid, counsel, the burden's on you in part here to persuade us that in obtaining the injunction, and we have to look at the record here, obviously, in more detail, the tribe didn't get what it was asking for. And so the government's obligation went up to $2 million. If you get the $2 million, the government has satisfied your claim. In other words, it's a settlement. We're going to put this injunctive relief to the $2 million. When we pay you that, all claims are satisfied. And you say, well, you're not that familiar. Well, I mean, I understand parties seek relief beyond the relief that the district court may award. But I'm trying to understand what was the nature of this injunctive relief. And that's why I started off. Let's just assume you get the total $2 million. Why isn't your claim resolved, as it were? And, I mean, you're likely more familiar than I am, Judge Child certainly is. You know, parties file complaints seeking relief on multiple grounds, but ultimately they may resolve matters with the other side and agree to some other figure or some other relief. And the case is over. That's what we're trying to nail down, because certainly the supplemental brief filed by the government suggests that. And you haven't disputed it. And that's why it was my first question. But anyway, I think we understand your position, subject to any questions that Judge Child may wish to... Judge, I'll just address briefly the points that Your Honor made. Your Honor, the relief we are seeking is the $2 million that we sought initially when we filed our complaint and then filed our second amended complaint. We're not seeking relief beyond that $2 million. That's right. So if you get your $2 million, you're satisfied, and the matter is moved. That's correct. Thus far, we've received only approximately $1 million. But you said there was another payment, so you've got $17 million. Anyway, I just want to be clear about that. And I think I'm clear now. And that answer may also affect the other tribe appellant. Thank you, Counsel.  Good morning, Your Honors. Adam Jett on behalf of the federal government. I have to please the Court. I'd like to begin, if I may, with a colloquy that Judge Rogers had with actually both of my friends about the statutory standard. Because the question, if you look at the statutory text, is not some sort of philosophical, distributive conception. The question is whether the Secretary has made a determination, one within just a zone of reasonableness, that the payments are based on increased expenditure. But there is inherent uncertainty if you're trying to estimate and trying to predict what increased expenditures are going to be. And so I think it's common ground among all the parties here that the issue is just selecting a proxy. The question is, which population measure is not necessarily the best proxy, but is at least within a zone of reasonableness, is to sort of use the language that this Court used in Shawnee, is not so unreasonable that it can no longer be considered a proxy for increased expenditures. And I think, then, that the plaintiffs can kind of tip their hands, actually, when both of them are at the podium, when they start referencing per capita payment. This is question begging. When the plaintiffs stand up here and say, one tribe received X amount per person and a different tribe received Y amount per person, they're presupposing that the relevant count of people are the number of enrolled members. In other words, their whole argument is assuming the answer that they want this Court to reach. But the question, everyone agrees that for the purposes of this proxy distribution, it will be per capita. The question is, what's the capital? Are you measuring the number of people based on the enrollment in the tribe, the number of citizens, no matter where they live? Are you measuring the number of people based on the number of individuals who live in their formula area population or some blend of those two figures? But the statute refers to increased expenditures. So, based on what you're saying here, how does that formulate? Sure, absolutely, Judge Childs. So, just stepping back again, I think everyone has common ground in this case. Everyone agrees that using some population measure is kind of acceptable as a proxy for increased expenditures. And maybe if I could just sort of briefly walk you through the administrative record. As the agency explained from the very beginning, you can find this at JA 751 to 753 and then 755 to 756. The idea is that, one, again, there were sort of three different tranches of money that were given out here. For the population-based tranche, the idea is that the more individuals that a tribal government is providing services for, the more, again, this is just an estimate, back of the envelope prediction of what will happen. But the more likely it is, then, that they will have more expenditures, these sort of person-based expenditures, as a result of the COVID-19 pandemic. I think the agency specifically talked about expenditures such as providing medical services. Now, that's the reason that the agency initially decided to use as a proxy the formula area population. This is a number that has been used by HUD and by other agencies to sort of figure out the population of people that a tribe is providing certain services for. And it's a number that essentially sort of captures the population of folks who live around the seat of the tribe, where the tribe is exercising control and the tribe is exercising services. Now, obviously, the plaintiffs believe that there's a different number that should be used, that the number that should be used is enrollment, the number of citizens, no matter where they may live. In this court, in the Shawnee decision, and I think it's very important that this not get lost, said that it didn't rule definitively, but sort of as a likelihood of success in the merits, it said that for zero population tribes, where the formula area population is zero, that for those folks, it seems like formula area population is not a reasonable proxy. So the government responded to that, such that for the zero population tribes, the government is solely using enrollment. At this point, the amount of money that a zero population tribes receives is the amount they would have received all federally recognized tribes have been evaluated solely based on enrollment and not by using formula area population. And then for the sort of additional number of tribes that are kind of close to them, low populations may very well be meaningful, but can see that we are low and somewhat disparate from their enrollment. There's a sort of additional plus up that's been provided. And I actually think this made them kind of pivot nicely to the call that Judge Rogers was just having with my friend at the end of the argument. Because when my friend indicates that they were seeking $2 million, obviously none of this is brief. This is coming up for the first time at the podium. But if your honors do go back to look at those sort of relevant district court filings, the $2 million figure that the Miccosukee were seeking was, and I apologize, I keep looking at the screen, but I realize the camera is actually in front of me. The $2 million figure was essentially a calculation that was reached based on using enrollment for the Miccosukee, or it may have been from the Miccosukee and the two other plaintiff tribes, but they're using formula area population for everyone else. But at this point, what the Miccosukee has received is a sort of per capita count that solely they used enrollment for them, premised on the idea that enrollment had been used for everybody else. And I think then that sort of paradox actually plays in nicely Judge Childs with the call that you were having with my friend about remedy. Because essentially what my friends are asking for is they're saying, so Prairie Rand, for example, was ranked number 63 on that ranking of ratio. They're saying, treat number 63 in the same way that you treat number one, sort of toss them up entirely such that they receive what they would have received if everyone had received money based on enrollment. But skip over everyone in between, and by the way, ignore everyone underneath us. But if what my friend was saying was correct, if there was some reason that enrollment is better, if there's some reason that the ratio between enrollment and formula area population is relevant, then either it's better for everyone else or it's relevant for everyone else. And that's then where the sort of redistribution formula comes into play, because the whole idea in 2021 is the secretary started with what this court said in Shawnee. This court said in Shawnee, if you have tribes that have enrollment, it's going to be a formula area population of zero and have a high enrollment. There's at least reason to believe that basically formula area population just isn't capturing what it's supposed to be. In other words, just to go back to the relevant statutory terms, that the number being used is no longer within a zone of reasonableness as a proxy for increased expenditures. And so that's why then for the zero population tribes, which now include Miccosukee after the government corrected their relevant error, that they're receiving funds totally based on enrollment. And then for others, it's just a weighting. It's essentially a sort of mashup of the two numbers. And because the whole idea is that the disparity between the two numbers calls into question the accuracy of using formula area population, the greater the disparity, the greater the plus up. So for the zero population tribes, they're plussed up all the way. And as you go down and the disparity gets smaller and smaller, the redistribution gets smaller and smaller. And one thing that I want to make sure doesn't get lost in this discussion is it's not just a redistribution out of the general treasury. Remember, these are being funds. These are funds that are being taken away from other recipients. Here from the ANCs, the plaintiffs haven't argued that there was any kind of error in giving funds to the ANCs. They haven't argued that there's some reason the ANCs should have received less funds. The ANCs just basically have the misfortune of having their funds tied up while there was a legal question that got litigated all the way up to the Supreme Court. So at this point, basically every dollar that is given to the plaintiffs is then taken away from someone else who also has a claim to that money. So you don't believe that plaintiffs representing what's left just goes to them? I think if nothing else, so obviously the government hopes that the district court's decision is affirmed. They're happy to explain why the government believes the district court's decision was correct. If the court were to determine that the district court erred, obviously what happens next, of course, would depend on the basis for this court's decision. If, for example, the court said, well, theoretically what the government did might be substantively reasonable, but there just wasn't enough explanation. And again, I'm happy to tell the court why I think there was enough explanation. But if the court concluded that there wasn't, then it would go back to the agency and then the agency would have the ability to sort of make a further explanation. If there was some other substantive error, if there's some reason, and it's really hard to imagine what this is, but if there's some reason that, for example, if you look deep within the heart of the statute, the term increased expenditures actually means use enrollment for the top 88 and then switch to formula area population as soon as you jump from 88 to 89. Hard to imagine how that could be the case. But if that were the case, then I think then you get a remand and it goes back to the agency. And again, this is just black letter administrative law. The agency then takes into account whatever the court said and can then make a sort of further distribution. And so I think when the colloquy was happening with Mr. Abbey about what the appropriate remedy is, and he suggested that the kind of reason that this preliminary injunction was entered in the first place is to benefit his client and to benefit Perry Band, I don't think that the fact that they got a kind of particular interim relief can then be used as a kind of foot in the door to kind of work backwards and enforce a particular remedy on the agency. So as for the kinds of appropriations questions that referenced up here, I've seen the parties haven't reached those at all. And I don't want to sort of stand on my feet and opine on what would be a sort of somewhat unusual application of appropriations law. But normally the black letter law is sort of once there's money that's kind of held up in litigation, even when an appropriation expires, that money can continue to be spent to kind of satisfy what ends up being a sort of final judgment in the litigation. Now, ordinarily, final judgment in an APA case is you set aside an action that's arbitrary and capricious, and you send it back to the agency to redo that action in a way that's not arbitrary and capricious. I don't want to get ahead of the agency. I think the agency could potentially choose, depending on what this court said, to distribute the funds in different ways and the sorts of appropriations issues that my friend referenced. I think it would be fair game for the agency to consider on remand, but I think it could be highly premature for the court to consider it. Well, I want to go back to you suggesting that you have explanations, because it did not appear that those were really in the record in terms of the data that you're relying on. And as I indicated earlier, there just seems to be a lot of different numbers and moving targets throughout the record. Sure. So I guess if I could sort of briefly just address the kind of conceptual issue with numbers and moving targets, and if I could kind of specifically kind of walk the court through the explanation. So as for kind of numbers and moving targets, as I began, this is all about proxies and estimates, because remember, as this money was going out the door, no one knew exactly what the increased expenditures were going to be. This was all an issue of what was going to happen in the future. In 2020, initially we thought it was funds that would be expended throughout 2020. Congress actually then amended the statute so that it would include funds that were expended through the end of 2021. So everything was just a sort of question of future predictions. The data sets that were being used at the agency was extremely clear on them. The whole conversation was about enrollment versus formula area population. The agency decision spells out in some detail exactly what formula area population is, that they're taking it from HUD to actually cite the relevant regulations, the relevant HUD regulations, which set out how formula area population is calculated. So as for that, I think the sort of data is pretty clear, and just in case this is what Your Honor was getting at, it is black-letter law. I think the Supreme Court's recent decision in Prometheus, among other things, establishes this, that an agency can't be required to sort of go out and just kind of create a whole new data set. An agency is allowed to basically use the data it has access to, and so the data that for purposes here were being used as potential proxies for increased expenditures, in addition to the expenses and the employment data that nobody is disputing here, for just one of these two populations. So then as for whether the agency provided a sufficient explanation for the phase-out, because, again, I think it is common ground here. Everyone agrees that zero population tribes at this point should be, or at least are, and this is undisputed, receiving funds as if all federally recognized tribes had been evaluated based on their enrollment. So the only question then is just whether there should be a sort of taper down, or, as I think Prairie Band is arguing for, basically whether the tribe in 63rd place should be treated the same as the tribe in first place, and then once you hit 88, there should be a fall-off. And so I just want to make sure that the court kind of sees the explanation that the agency provided. We spell this out to some extent if the court sort of wants to look at a further discussion of it on pages 47 to 49 of our brief, but basically the concern, the whole thing that motivated this, stemming from this court's final decision, is the disparity between the two measurements. And you can find the agency's discussion at JA1395 and JA1400. And so because it's the disparity that kind of raises this question of whether the initial measurement, formula area population, was an unreasonable proxy, then further adjustment that gets made. And now I'm quoting the agency's decision on page 1400. The adjustment is, quote, based on the disparities. So I think there's sort of a little bit of a game of shadow boxing going on here, where the plaintiffs say it was sort of an unexplained, fatal complete, that the agency just never explained why it is that there was a taper, why it is that there was a phase-out. The agency didn't explain it quite. In other words, the agency didn't first say, what's driving us are the disparities, we care about the magnitude of the disparities, and then again say, we're going to have a phase-out, and the reason we're having a phase-out is what's driving us is the disparities, and the phase-out would be based on disparities. But there's no legal requirement that an agency say something twice. When you're looking at an agency explanation, again, this is just black-letter administrative laws, the court well knows, you read the explanation as a whole, and the question, just to use the sort of governing Supreme Court standard, is whether the path may reasonably be discerned. And so when the agency says, the concern is the disparity, and we're making an adjustment based on the disparities, and then they sort of say they're going to have a taper, a phase-out, and they explain the formula, the taper and the phase-out is following logically from the issue of disparities. In other words, if you're having an adjustment based on disparities, the less the disparity, the less the adjustment. Unless the court has any other questions. What do you make of the district court's in Shawnee 1 statement about there will be a likelihood of success on the merits? Your Honor, I apologize, I couldn't quite hear you. What do you make of the district court's statement in Shawnee 1 about there being a likelihood of success on the merits? Well, Your Honor, I think Your Honor is referring to this court's decision and what's being referred to as Shawnee 1. Yes, I'm sorry, this court's decision. So I think this court's decision in Shawnee 1 underscores everything that the agency did in response to this court. So this court, in Shawnee 1, if you look at the decision, the sole plaintiff there was what is being kind of colloquially called a zero-population tribe. It was a tribe that had zero formula area population, but did have a significant number of employees. One of the employees, who is now a plaintiff here, was also a zero-population tribe. And with respect to the plaintiff there, and then the court suggested that this might be true for Nicosuke as well. It said, I mean, if you just read it, it repeatedly refers to there being zero-population tribes. And it says for these folks, zero-population tribes, it looks like using formula area population is an unreasonable metric. And so Treasury responded to that. And in fact, what Treasury has now done is for all of what are being called the zero-population tribes, formula area population has entirely dropped out. All that is being considered is enrollment. And again, just to be clear, enrollment isn't being considered only for them and no one else. They've received what they would have received if everybody had been evaluated based on enrollment, which is what they have been looking for the entire time. Now, I should point out, my friend from Prairie Band was standing up here, and he indicated that Prairie Band filed an amicus brief in Shawnee 1. Notice that in Shawnee 1, this court referred to the facts of there, the amicus micosuke. It didn't refer there to the facts of Prairie Band. And, you know, as we spell out in our brief, this is the sort of nature of an agency having discretion. I think in response to Shawnee 1, one thing that Treasury could have done is said, look, the D.C. Circuit has indicated that when there's just zero formula area population, basically just no one knows what to make of that number. Maybe that number can't be trusted. Maybe it's not a reasonable proxy. And you could have stopped there, could have only provided additional funds to those who had zero formula area population. But instead, the agency went a little bit further. The agency said, you know, some of this logic, sort of some of what seems to be driving the concern about the zero tribes could potentially stretch a little bit further. And that's why you end up with this kind of boundary zone past the zero population tribes. And that's why Prairie Band is kind of having this conversation at all. Because when you have a tribe like Prairie Band, which does have a meaningful formula area population, the fact that its enrollment is greater than its formula area population, could be the very reason that the agency selected formula area population in the first place, which is that's the number of folks who kind of live near the tribe, the tribe is generally entrusted with providing services to. And by the way, just to make sure that this doesn't get lost, although the plaintiffs here are plaintiffs where their enrollment is higher than their formula area population, there are plenty of tribes, and we cite some examples in the record of tribes talking about that, where those tribes' formula area population is a lot bigger than their enrollment. Because there are plenty of tribes who are providing not just for their own members, but are providing for lots of Native American members of other tribes, some of whom may very well be enrolled members in the plaintiff's tribes and would potentially be double counted. So, you know, again, just stepping back, at the end of the day, this is the nature of administrative decision making. You can't predict the future. You can't do anything perfectly. The question is just whether Treasury has acted within a zone of reasonableness. In predicting whether there's increased expenditures, and again, just to say this one more time, with a limited pool of funds, in not taking essentially an infinite amount of money away from the Alaska Native corporations, who nobody has disputed were properly assigned the initial amount of money that is now being taken away from them. Thank you. Judge Rogers, any questions?  Thank you. Thank you, Your Honor. All right. Just quickly, one note about the record, and this is an important note. Mr. Jedd makes reference to Joint Appendix 1400, where Treasury for the first time mentions based on disparities. 1400 was not contemporaneous with the revised methodology. 1400 comes out months later, when Treasury is actually figuring out this single race versus multi-race issue that had resulted in Prairie Band receiving successive payments. They've already seen the second complaint at the time that Joint Appendix 1400 is developed by the Treasury, and they're already anticipating the arguments that are raised in the complaint and trying to rebut them. It's not contemporaneous decision-making. Treasury, even in that, concedes, at that point in the record, concedes that the 2021 methodology is not based on increased expenditures, but it's based on these disparities. And Treasury repeats this point at pages 30 and 32 of its brief. You didn't hear any connection to justify the differential treatment for Prairie Band receiving $900 per person, whereas the tribes at the top received approximately $1,800 per person. Nothing at all is connected based on increased expenditure. Mr. Jedd makes reference to the idea of blending, that there's some sort of weighing of the two factors. That's not the case here. If there had been any blending, it wouldn't be the case that Prairie Band with a far greater 747 IHBT population and a 4515 enrolled population would be receiving $1.3 million less than Shawnee Tribe that had a zero IHBT population metric and 3,000 enrolled members. If there were a blending, there would be some convergence. There's no convergence. Total inversion of the original approach. Okay. Anything new? That's nothing further, Your Honor, unless you have any further questions for me. Judge Charles may have some questions. I don't. Thank you. Thank you, Your Honors. I do want to address a couple of points that Mr. Jedd made, and I want to emphasize to the court that our Mikusiki's case is not moot. We dispute his representation that all zero tribes have been treated equally. We don't have any information in front of us. The court doesn't have any information in front of the court to determine whether that's accurate or not. The statement was not that, but that simply in obtaining the injunction by the district court, Mikusiki agreed that upon receiving the $2 million, its claims were satisfied. Your Honor, and I don't want to cut you off, we have not received the $2 million. Counsel, you said that several times. And my hypothetical was based on the assumption that the secretary is not going to violate the district court's order of injunction. That's all. So you get your $2 million. And if you get your $2 million, your claims are satisfied. And I thought at the end of your argument to us, you admitted that. What you're saying now is just what you said before. And it doesn't in any way undercut that in getting the injunction for $2 million, upon receiving the $2 million, your claims are satisfied. And you may have had other claims, but you agreed to this injunction that the district court entered in your favor. And that is all correct, Your Honor. My point is, and we agree, if Mikusiki receives the $2 million, then we are satisfied. But we have not received $1 million. And the last point I wanted to make is... Counsel, in reply, that is nothing new. You're just repeating. And you're not taking back your statement that when you get the $2 million, your claims are satisfied. That's correct. All right, fine. So, Mr. Jett, I do want to address this point about a zone of reasonableness. Of course, we don't dispute that a zone of reasonableness would apply in most APA cases in attempting to evaluate the government's decision-making in an APA case. But consider the facts here. The formula, which they are defending, did not produce results that are in a zone of reasonableness. It produced these skewed results. So a tribe with an IHBG formulary of population of 600 receives $2 million, but a tribe with a population of 600 receives only $1 million. That is not within a zone of reasonableness. That is the definition of disparate treatment, and that clearly is arbitrary and capricious. Well, with all due respect, the zone of reasonableness does not only look at the dollar amount, but it looks at the context in which the Secretary is ruling. And I'm happy to address the context, Your Honor. All right. If you get your $2 million, you're satisfied. We definitely are satisfied if we get our $2 million. Thank you. Thank you, Your Honor. Thank you. Of course, the court will take this matter under advisement. Thank you.
judges: Childs, Silberman, Rogers